Filed 4/19/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| NEW CINGULAR WIRELESS PCS, LLC et al., | |
|     Petitioners, | A144005 |
| v. | |
| PUBLIC UTILITIES COMMISSION OF THE STATE OF CALIFORNIA, | (California Public Utilities Commission Decisions 13-05-031, 14-06-026, 14-12-085) |
|     Respondent; | |
| THE UTILITY REFORM NETWORK et al., | |
|     Real Parties in Interest. | |

Here we decide whether the Public Utilities Commission of the State of California (CPUC) properly awarded fees and costs to two intervenors, The Utility Reform Network (TURN) and the Center for Accessible Technology (CforAT), for their work in a complex telecommunications merger review proceeding dismissed by the CPUC as moot for reasons unrelated to anything that happened in the proceeding itself.

A group of entities affiliated with AT&T, Inc. (AT&T), one of the merger proponents, filed a petition for a writ of review seeking reversal of these awards. The petition alleges that neither TURN nor CforAT "substantially assisted the commission in the making of its order or decision" (Pub. Util. Code, § 1802) and therefore that neither of them made a "substantial contribution" to the proceeding, as that phrase is specifically

1

defined in Public Utilities Code, Part I, Chapter 9, Article 5, sections 1801 et seq. (Article 5),[1] the statutory scheme governing intervenor compensation in the CPUC's proceedings.

We deny the requested writ relief, but for reasons explained below will nonetheless vacate the challenged awards without prejudice to the renewal and redetermination by the CPUC of TURN's and CforAT's requests for fees and costs.

## I. PROCEDURAL BACKGROUND

Five years ago, AT&T sought to acquire T-Mobile USA, then a subsidiary of Deutsche Telekom, and merge the operations and infrastructure of T-Mobile USA into itself. The prospect of this combination attracted immediate and intense regulatory scrutiny nationwide.

Beginning in approximately April 2011, when the AT&T/T-Mobile merger proposal was announced, and for the next five months, the Federal Communications Commission (FCC), the United States Department of Justice, and various state regulatory agencies, undertook overlapping investigation and review proceedings to determine whether the merger would have adverse effects on competition and customer service, and if so, whether mitigation measures were warranted as a condition of regulatory approval. In California, the center of the action was the CPUC's investigatory proceeding in this case, Investigation No. 11-06-009 (hereafter Docket No. I11–06–009), which commenced June 9, 2011 pursuant to an Order Instituting Investigation (OII). Among the participants in Docket No. I11-06-009 were the petitioners here, New Cingular Wireless PCS, LLC, AT&T Mobility Wireless Operations Holdings Inc., Santa Barbara Cellular Systems, Ltd., and AT&T Mobility Wireless Operations Holdings, LLC (collectively, New Cingular), which are all entities owned directly or indirectly by AT&T.

The OII set an expedited schedule under which any and all comments from interested parties had to be submitted within 60 days. Procedurally, the CPUC sought to carry out and complete the investigation of a complex transaction having national scope

---

[1] Unless otherwise indicated, all statutory references are to the Public Utilities Code.

within a few months, and in doing so, to build an evidentiary record robust enough for the CPUC's staff to prepare written comments for filing in the FCC proceedings. The end goal was to enable the CPUC to provide its input on the impact of the proposed merger in California and to take a position on any appropriate mitigation conditions, should the merger be approved by the FCC. Since the FCC proceedings were themselves unfolding on an expedited schedule, with a target for completion by year-end 2011, maintaining the required schedule in Docket No. I11-06-009, without slippage, was of paramount importance. The CPUC apparently believed it could not accomplish all of this on its own, solely with staff support, because upon issuance of the OII it immediately invited participation from a group of intervenors, including TURN and CforAT.

TURN appears to have taken a leading role in the proceeding from the beginning, starting with its successful advocacy concerning the need for an intensive review of the proposed transaction before the OII even issued.[2] At the outset of the proceeding, TURN won some crucial procedural victories that kept things on track, first defeating an effort by AT&T to stop the investigation based on jurisdictional and preemption arguments that the CPUC has no authority to regulate wireless telephone carriers,[3] and then arguing successfully that the OII proceeding should be categorized as a "procedural rate-setting proceeding," which had the effect of triggering a number of rules designed to ensure

---

[2] *Decision Granting Compensation to the Utility Reform Network for Substantial Contributions to Decision 12-08-025* (May 23, 2013) Cal.P.U.C. Decision No. 13-05-031, page 5 <http://www.cpuc.ca.gov/> [2013 Cal.P.U.C. Lexis 270, p. *3] (hereafter Decision No. 13-05-031) ("In meetings with the Commission leading up to the issuance of the OII, and in a pleading after the OII was adopted, TURN advocated that the Commission had a statutory responsibility to do a detailed review of the proposed merger.").

[3] Decision No. 13-05-031, *supra*, at page 6 ("While not specifically ruling on [jurisdictional and preemption] issues, the Commission's actions were consistent with TURN's recommendations. The Commission moved forward with the investigation and issued an ALJ ruling" containing information requests in accord with the scope of inquiry TURN sought.).

public transparency (among other things, restrictions on ex parte contacts).[4] On TURN's motion, the administrative law judge (ALJ) took official notice of a complaint filed by the Department of Justice seeking to enjoin the AT&T/T-Mobile merger.[5] TURN also prevailed in numerous scheduling disputes and discovery contests.[6] As a result of these preliminary rulings, TURN and all other parties in Docket No. I11-06-009 were able to obtain, subject to a protective order, thousands of pages of confidential data—including a financial model of the proposed merger that was essential for economic analysis of its impacts in California—in time to analyze and file detailed comments within the tight time-frames required by the schedule.

The CPUC placed a high priority on obtaining maximum public input during the investigatory process. Thus, "[c]onsistent with the direction set forth in the OII, the Assigned Commissioner and the ALJ held workshops and public participation hearings throughout California in the month of July [2011], to gather information on specific issues related to the proposed merger and to hear public comment. Each workshop was facilitated by the assigned ALJ, with the assigned Commissioner and other Commissioners in attendance. Participants at each workshop included independent experts, representatives of the respondents and other market participants, and representatives of other interested groups, including unions, consumer advocates, and others. Each workshop consisted of panel presentations, and provided opportunities for parties to ask questions of panel members. Each workshop also included time during

---

[4] Decision No. 13-05-031, *supra*, at pages 4–5 ("AT&T objected to the ['ratesetting'] categorization as 'a matter of law' asserting that since the commission has no authority over rates of wireless carriers, then the Commission could not categorize the proceeding as 'rate-setting.' " TURN opposed the appeal, and "[w]hile there was no official ruling on the categorization appeal, the Commission retained the ratesetting category consistent with the outcome TURN recommended.").

[5] Decision No. 13-05-031, *supra*, at page 16.

[6] Decision No. 13-05-031, *supra*, at page 16 ("It is notable that TURN prevailed on all its issues relating to getting access to AT&T materials as well as in seeking extensions of time to permit TURN and other parties to analyze such materials and develop appropriate pleadings.").

4

which members of the public could comment." (*Decision Dismissing Investigation Into Acquisition of T-Mobile by AT&T and New Cingular Wireless* (Aug. 23, 2012) Cal.P.U.C. Dec. No. 12-08-025, p. 6 [2012 Cal.P.U.C. Lexis 365, p. *8] (hereafter Final Decision and Order).)

A key piece of the CPUC's record-building process in Docket No. I11-06-009 was economic analysis, which is often at the core of antitrust litigation, and is something that typically requires examination of voluminous financial data. In this area, the bulk of the work was done by TURN's expert economist, Dr. Trevor Roycroft, who filed a detailed affidavit setting forth his opinions in August 2011. Before filing his affidavit, Dr. Roycroft appeared and presented his views at a public workshop on July 22, 2011. At all three workshops, speakers from TURN presented their views, arguing that the proposed merger would have serious anticompetitive effects in California. Consistent with the position it took from the beginning of the proceeding in favor of public transparency, TURN later sought to persuade the ALJ that the transcripts of these workshops should be posted and made available publicly. The ALJ so ordered.[7]

Before the CPUC had occasion to prepare comments for submission to the FCC, AT&T and Deutsche Telekom unexpectedly announced the withdrawal of their proposed merger transaction (see Federal Communications Com., Order No. DA 11-1955 (Nov. 29, 2011) p. 2, at <https://apps.fcc.gov/edocs_public/attachmatch/DA-11-1955A1.pdf> [as of April 19, 2016].), and in November 2011 moved to dismiss Docket No. I11-06-009 on grounds of mootness. The CPUC granted that motion on August 23, 2012 (the Final Decision and Order). The Final Decision and Order was more than a naked, unexplained dismissal. It addressed and decided a number of collateral matters, including whether to adopt all of the interim rulings that had issued in the course of the proceeding. In section 5 entitled "Affirmation of All Rulings," the CPUC explained: "All Rulings by the assigned ALJ and assigned Commissioner in the course of this proceeding, including

---

[7] *Administrative Law Judge's Ruling Placing Workshop Materials in the Record and Memorializing Several Electronic Mail Rulings* (Sept. 19, 2011) Cal.P.U.C. Docket No. I11-06-009; see Decision No. 13-05-031, *supra,* at page 16.

rulings made by electronic mail, are affirmed. Rulings affirmed through this decision include the July 5, 2011, ruling requiring that AT&T provide and pay for support services for all workshops and public participation hearings held in this proceeding. In addition, this decision affirms various electronic mail rulings modifying the proceedings, schedules, granting party status to [specified intervenors], and addressing other procedural issues."

The Final Decision and Order also addressed the issue of intervenor compensation, explaining as follows: "The former merger proponents moved to dismiss this proceeding after approximately six months of concentrated effort to evaluate the proposed transaction, undertaken in good faith by Commission staff and parties participating in this proceeding. Given the advanced stage of the proceeding at the time the respondents abandoned the proposed transaction and requested dismissal, it is reasonable for the Commission to acknowledge the work done by parties to this proceeding, and to explicitly state that requests for intervenor compensation are appropriate." TURN and CforAT then moved for awards of intervenor compensation, and in subsequent orders— each of which, in turn, was based on detailed findings explaining the "substantial contributions" TURN and CforAT made to specific rulings prior to dismissal—the CPUC issued the compensation awards that are now at issue (respectively, the TURN Award and the CforAT Award). These orders were finalized following denial of a motion for rehearing on December 18, 2014 (the Rehearing Decision).[8]

_____

[8] (See Decision No. 13-05-031, *supra* [granting $255,944.03 in compensation to TURN]; *Decision Awarding Compensation to Center for Accessible Technology for Substantial Contribution to Decision 12-08-025* (June 12, 2014) Cal.P.U.C. Dec. No. 14-06-026 [2014 Cal.P.U.C. Lexis 247] [granting $20,286.42 in compensation to CforAT] (hereafter Decision No. 14-06-026); *Order Modifying Decision Nos. 13-05-031 and 14-06-026 and Denying Rehearing* (Dec. 18, 2014) Cal.P.U.C. Dec. No. 14-12-085 [2014 Cal.P.U.C. Lexis 629] (the Rehearing Decision).) The underlying findings are set forth in the form of a chart running thirty-four pages in TURN's case, and twelve pages in CforAT's case. These charts, which in effect track proposed findings by TURN and CforAT, have three columns. The first column, labeled "Contribution," describes the claimant intervenor's advocacy during the course of the proceeding on specific issues; the second column, labeled "Specific References to Claimant's Presentation and Decision,"

6

New Cingular now petitions for review in this court, urging us to reverse the Final Decision and Order insofar as it finds TURN and CforAT to be eligible for intervenor compensation, and to reverse outright the three orders that followed the eligibility finding—the TURN Award, the CforAT Award, and the Rehearing Decision.

### III.   DISCUSSION

Section 1803 provides, in essence, that the CPUC shall award reasonable advocate's fees, expert witness fees, and costs of preparing for and participating in a proceeding, to any customer who makes a "substantial contribution to the adoption, in whole or in part, of the commission's order or decision," and for whom such participation or intervention imposes a "significant financial hardship."  (§ 1803, subds. (a) & (b).) New Cingular challenges the compensation awards to TURN and CforAT on the ground that neither of them could have made a "substantial contribution" to any "decision or order" of the CPUC because AT&T withdrew its proposed merger with T-Mobile for reasons unrelated to anything these intervenors did or argued in Docket No. I11-06-009. The implicit premise of this contention, at least as presented in New Cingular's briefs— and as acknowledged explicitly by New Cingular's counsel at oral argument—is that, to qualify as a "substantial contribution," an intervenor's advocacy must contribute to an "order or decision" *on the merits*.

New Cingular's interpretation of Article 5 is based on statutory provisions contemplating that requests for compensation awards may be made only after issuance of the "final order or decision by the commission in the hearing or proceedings" and that,

cross-references an order or decision, in virtually every instance showing a clear linkage; and the third column, labeled "Showing Accepted by CPUC," allowed the CPUC to indicate whether it agreed with the proposed findings on an issue-by-issue basis.  All of TURN's and CforAT's proposed findings were accepted by the CPUC.  For TURN, the supporting findings list seven specific rulings  that adopt or reflect a position taken by TURN, beginning with the OII itself.  (See Dec. No. 13-05-031, *supra,* at pp. 1–19 [listing the OII and later rulings dated June 28, 2011, July 19, 2011, Aug. 11, 2011, Aug. 31, 2011, Sept. 19, 2011, Nov. 16, 2011].)  And for CforAT—which had a much narrower role in the proceeding than TURN did, and the amount of its award was commensurately lower—the supporting finding lists one specific ruling.  (See Dec. No. 14-06-026, *supra,* at p. 4 [listing ruling of Aug. 11, 2011].)

upon the making of any such request, "the commission shall issue a decision that determines whether or not the customer has made a substantial contribution to the final order or decision in the hearing or proceeding." (§ 1804, subds. (c) & (e).) While this reading of Article 5 has some surface plausibility, given the references to a "final order or decision," the record in this case illustrates that the CPUC's reading of section 1803, subdivision (a) is equally plausible, since its final order in Docket No. I11-06-009 expressly adopts all interim procedural rulings made prior to dismissal. Thus, we are presented with an ambiguity.

" 'As in any case involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose.' [Citation.] The rules for performing this task are well established. We begin by examining the statutory language, giving it a plain and commonsense meaning. [Citation.] We do not, however, consider the statutory language in isolation; rather, we look to the entire substance of the statutes in order to determine their scope and purposes. [Citations.] . . . That is, we construe the words in question in context, keeping in mind the statutes' nature and obvious purposes. [Citation.] We must harmonize the various parts of the enactments by considering them in the context of the statutory framework as a whole." (*People v. Cole* (2006) 38 Cal.4th 964, 974–975 (*Cole*). To discern the legislative intent here, we begin our analysis with an examination of the statutory language, setting out the relevant text of Article 5, placed within its overall context and structure.

A.      **The Text and Structure of Article 5**

Article 5 opens with a broad statement of purpose: "The purpose of this article is to provide compensation for reasonable advocate's fees, reasonable expert witness fees, and other reasonable costs to public utility customers of participation or intervention in any proceeding of the commission." (§ 1801.) There follows a more specific statement of legislative intent. "It is the intent of the Legislature that: [¶] . . . [¶] (b) The provisions of this article shall be administered in a manner that encourages the effective and efficient participation of all groups that have a stake in the public utility regulation process. [¶]. . . [¶] (d) Intervenors be compensated for making a substantial contribution to proceedings

8

of the commission, as determined by the commission in its *orders and decisions*. . . ." (§ 1801.3, italics added.)  Next, there is a series of definitions, including the following: "(f) 'Proceeding' means an application, complaint, or investigation, rulemaking, alternative dispute resolution procedures in lieu of formal proceedings as may be sponsored or endorsed by the commission, or other formal proceeding before the commission.  [¶] . . . [¶] . . . [¶] (i) 'Substantial contribution' means that, in the judgment of the commission, the customer's presentation has substantially assisted the commission in the making of its *order or decision* because the *order or decision* has adopted in whole or in part one or more factual contentions, legal contentions, or specific policy or procedural recommendations presented by the customer . . . ."  (§ 1802, italics added.)

These definitional sections are followed by a series of clauses addressing eligibility for compensation.  "Participation by a customer that materially supplements, complements, or contributes to the presentation of another party, including the commission staff, may be fully eligible for compensation if the participation makes a substantial contribution to a commission *order or decision*, consistent with Section 1801.3."  (§ 1802.5, italics added.)  The core eligibility criteria—and the focal point of the dispute in this case—are twofold.  "The commission shall award reasonable advocate's fees, reasonable expert witness fees, and other reasonable costs of preparation for and participation in a hearing or proceeding to any customer who . . . satisfies both of the following requirements:  [¶]  (a) The customer's presentation makes a substantial contribution to the adoption, in whole or in part, of the commission's *order or decision*. [¶] (b) Participation or intervention without an award of fees or costs imposes a significant financial hardship."  (§ 1803, italics added.)

Finally, Article 5 concludes with a series of clauses that set out pre-conditions to eligibility, mostly procedural in nature, including the following: "(c) Following issuance of a final *order or decision* by the commission in the hearing or proceeding, a customer who has been found . . . to be eligible for an award of compensation may file within 60 days a request for an award.  The request shall include at a minimum a detailed description of services and expenditures and a description of the customer's substantial

9

contribution to the hearing or proceeding. . . . [¶] . . . [¶] (e) Within 75 days after the filing of a request for compensation pursuant to subdivision (c), . . . the commission shall issue a decision that determines whether or not the customer has made a substantial contribution to the final *order or decision* in the hearing or proceeding." (§ 1804, subds. (c) & (e), italics added.)

On its face, the above language yields no definitive answer to the statutory construction question presented here. That question turns on the meaning of the phrase "order or decision," which appears in section 1802, subdivision (i); section 1802.5; section 1803, subdivision (a); and section 1804, subdivisions (c) and (e). The context surrounding the use of "order or decision" in each of these clauses sheds no particular light on the meaning of the phrase. Semantically, the words "order or decision" could be given any number of permissible interpretations,[9] all of which at some level call for an assessment of how "substantial" an intervenor's contribution must be to the "order or decision" in question if it is to trigger compensation eligibility. Rather than look at this interpretive issue in binary terms as a matter of winning or losing in the final order terminating a proceeding, the CPUC appears to view it as a matter of context and degree, to be evaluated in its considered discretion against the backdrop of the proceeding as a whole. As explained in more detail below we conclude that is a reasonable interpretation of the key statutory provisions (§§ 1802, subd. (i), 1803, subd. (a) & 1804, subds. (c) & (e)), when they are read together, giving meaning to each one, with the Legislature's expressly stated intent in mind (see § 1801.3).

New Cingular's position runs contrary to the statutory language contemplating that even a "procedural recommendation[]" (§ 1802, subd. (i)) if adopted by the CPUC in a "final order or decision" (§ 1804, subd. (c)) will justify an award of compensation. Here,

---

[9] For example, to merit an award of compensation, an intervenor's contribution to an "order or decision" could mean contributing to (1) any outcome determinative "order or decision," whether on the merits or on a procedural matter; (2) any "order or decision," whether on the merits or a procedural matter, so long as it terminates the proceeding; or (3) any "order or decision," whether or not it is on the merits or on a procedural matter, so long as it is included in the order terminating the proceeding.

Section 5 of the Final Decision and Order affirms all interim decisions of the ALJ and Assigned Commissioner. Some of the procedural positions taken by TURN are reflected in formal interim rulings, and some others, although not memorialized in any written order,[10] were effectively followed. What is important, though, is not the form in which positions taken by TURN were adopted, but that the CPUC *decided* to adopt some position TURN advocated. By proceeding through discovery to the brink of preparing comments on the merits, the CPUC implicitly decided to reject the argument that it was powerless to proceed; and because it treated the proceeding, procedurally, as a rate-setting matter, it implicitly decided to follow TURN's classification recommendation. These were not trivial procedural matters in the overall context of the proceeding. For its part, CforAT apparently joined in many of the positions advocated by TURN, which presumably ensured that the proceedings included a uniquely valuable point of view from the standpoint of consumers with disabilities. Although the findings supporting CforAT's contributions suggest that its procedural contributions were, by comparison to TURN, more modest, so was the amount of its award. Thus, as we read the record here, the CPUC's position appears to be more consistent with the statutory language than the position proffered by New Cingular.

## B. The Statutory History

For confirmation of the legislative intent, we may look to the pertinent statutory history and the wider circumstances of Article 5's enactment. (See *Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 ["Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent."].) In this case, that history is complex and multilayered, as will become apparent, but after taking stock of everything, we conclude that the CPUC's reading of the statutory text aligns best with the legislative intent.

---

[10] See footnotes 3 and 4, *ante* (positions taken by TURN on jurisdictional and classification issues).

1.      *The Origins of Article 5*

The model for Article 5 was a set of regulations adopted by the CPUC in 1980 pursuant to a federal statute, the Public Utilities Regulatory Policies Act of 1978 (PURPA), 16 U.S.C. sections 2601 et seq.  Section 122 of PURPA allows intervenors in electric utility regulatory proceedings to bring an action for reimbursement of their participation costs in state court for having "substantially contributed" to those proceedings.  (16 U.S.C. § 2632(a)(1) & (2).)  But resort to state court is not required under PURPA if the state regulatory authority has a "reasonable procedure" for awarding compensation on the same basis. (16 U.S.C. § 2632(a)(2).)  To establish such a procedure, on June 27, 1980 the CPUC promulgated regulations permitting intervenors to request compensation in regulatory proceedings contemplated by PURPA.  (See 1993 Cal. Code Regs., tit. 20, art. 18.5, former §§ 76.01–76.11 (rules 76.01–76.11) & history foll. § 76.01, p. 22.2 (hereafter PURPA Regulations).)  Under rule 76.06 of the PURPA Regulations, the basic test for entitlement to an award, a test which in turn comes from section 122, subdivision (a) of PURPA (16 U.S.C. § 2632(a)), authorized awards of compensation to any participating "consumer" in a covered electrical utility proceeding who "substantially contributed to the adoption, in whole or in part, in a Commission order or decision, of a PURPA position advocated by such consumer related to a PURPA standard."  (PURPA Regulations, rule 76.06.)

From the beginning, the CPUC took the view that because it could not anticipate the procedural nuances of every situation that might arise in the application of the "substantial contribution" test, it would have to flesh out the meaning of that concept over time, using its discretion.  In its order adopting the PURPA Regulations, the CPUC noted that, since Congress intended the term "substantially contributed" to be broadly construed under PURPA (*Utah State Coalition of Senior Citizens v. Utah Power & Light Co.* (Utah 1989) 776 P.2d 632, 638; H.R.Rep. No. 95-1750, 2d Sess. (1978), reprinted in 1978 U.S. Code Cong. & Admin. News, pp. 7797, 7817), it intended to take a similarly expansive approach in implementing the PURPA Regulations:  "There are many questions about the terms used in Section 122(a) which require the exercise of judgment

12

by the commission.  We adopt rules today which provide guidance to this exercise of discretion but do not rely on precise formulae to resolve all concerns.  [¶]  The phrase 'position advocated by such consumer' is an example of language in the section which require[s] flexibility in interpretation.  Some would construe this to mean the specific end result in a decision advocated by the consumer.  Others would construe this to mean a factual or legal contention upon which a recommendation is based.  [¶]  Similar questions arise regarding the nature of a 'substantial contribution'.  *Decisionmaking is a process. Substantial contributions are made in many ways and at many times in the process.*  A record is more than a dry tabulation of facts leading to a clear decision.  [¶]  Persuasively raising a new issue at a prehearing conference[, for example,] can change the nature of a proceeding [. . . , just as] [i]ntense cross-examination of a single key witness can contribute more than any entire affirmative presentation."  (*Order Establishing Rules to Compensate Qualified Electric Consumers for their Participation in Electric Utility Rate Proceedings* (1980) 4 Cal.P.U.C.2d 3, 8, [1980 Cal.P.U.C. Lexis 636, *21–*22], italics added (hereafter Order Establishing PURPA Regulations).)

### 2.     *Consumers Lobby Against Monopolies v. CPUC*

Outside of the context of electric utilities regulation proceedings covered by the PURPA Regulations, the CPUC initially viewed its authority to award intervenors compensation for participating in its proceedings as quite limited.  In *Consumers Lobby Against Monopolies v. Public Utilities Com.* (1979) 25 Cal.3d 891 (*CLAM*), the California Supreme Court adopted that view as well, at the CPUC's urging.  In *CLAM*, two consumer advocates sought compensation for their participation in CPUC proceedings.  The first of these parties, Consumers Lobby Against Monopolies (CLAM), filed a reparations complaint with the CPUC alleging that Pacific Telephone and Telegraph (Pacific) was failing to collect equipment disconnection charges from commercial customers.  Following a settlement in which Pacific agreed to pay $400,000 into a CPUC-approved fund for public benefit, CLAM sought reimbursement for the time and expenses it spent pursuing the matter.  (*Id.* at pp. 897–898.)  In a separate proceeding,

13

the second consumer advocate group, TURN,[11] requested an award of fees and costs on the ground that its advocacy in a multiparty rate-setting proceeding led Pacific to adopt significant reforms, including the cessation of certain " 'wiretapping/monitoring' " activities that only TURN had focused on in the case. (*Id.* at p. 898.)  The CPUC denied both compensation claims, taking the position in each case that it had no authority to award fees and costs.  (*Id.* at p. 897.)

In consolidated writ proceedings, the Supreme Court reversed in part.  (*CLAM*, *supra*, 25 Cal.3d at pp. 915–916.)  Drawing a distinction between quasi-judicial proceedings, such as the complaint proceedings in which CLAM had been involved, and quasi-legislative proceedings, such as the rate-setting proceedings in which TURN had been involved, the court ruled that the CPUC had authority to award compensation to CLAM, but not to TURN. (*Id.* at p. 913.)  In quasi-adjudicatory proceedings, the court explained, the CPUC has equitable powers analogous to those of a judicial tribunal, and thus a fee award was justified under the "common fund" doctrine where a litigant confers a significant benefit on others.  (*Id.* at pp. 905–908.)  But with respect to TURN, the "[c]onsiderations . . . militat[ing] in favor of recognizing equitable jurisdiction to award attorney fees in reparation cases . . . do not apply . . . ." (*Id.* at p. 909.)  Echoing concerns that the CPUC itself raised, the court held that because of the complexity of the issues in rate-setting cases, the task of evaluating and separately valuing the contributions of the many parties involved was impracticable.  (*Id.* at pp. 909–910.)  The petitioners attempted to argue that section 701, a broad and expansive grant of CPUC regulatory authority, may be read to confer blanket authority to award intervenor compensation, but the court was unpersuaded.  (25 Cal.3d at pp. 910–911.)  "The decision to include such 'public participation costs' in ratemaking proceedings is . . . appropriately within the province of the Legislature," the court said.  (*Id* at p. 912.)

---

[11] At that time TURN stood for Toward Utility Rate Normalization, but it later changed its name to The Utility Reform Network. (See <http://www.turn.org/donate/sylvia.pdf> [as of April 19, 2016].)

14

3.    *The OII 100 Regulations, <u>Southern California Gas</u>, and the Enactment of Article 5*

Following the decision in *CLAM*, the CPUC shifted course and began to take a broader view of its authority to grant intervenor compensation in ratemaking proceedings. In May 1983, it promulgated a new set of regulations, providing for the award of public participation costs to eligible intervenors in virtually all formal CPUC proceedings, including rate-setting proceedings.  (1993 Cal. Code Regs., tit 20, art. 18.6, former §§ 76.21–76.32 (rules 76.21–76.32) & history foll. § 76.21 (the OII 100 Regulations).) In a reversal of the position it took in *CLAM*—where it argued that it did not have authority to award intervenor compensation under section 701 (*CLAM*, *supra*, 25 Cal.3d at pp. 897, 906)—the CPUC cited section 1701, the basic grant of statutory authority allowing the CPUC to make rules of practice and procedure in proceedings before it, as the statutory authority for these rules.[12]  Adopting a variation on the PURPA-derived test that would later appear in Article 5, the PURPA and OII 100 Regulations allowed participants in covered proceedings to claim reimbursement for fees and costs upon a showing of "significant financial hardship" where a "substantial contribution" to the proceedings was made.  (PURPA Regulations, rule 76.05; OII 100 Regulations, rule 76.26.)

In the OII 100 Regulations, the CPUC formally codified the idea—announced in 1980 in its Order Establishing PURPA Regulations—that it would use its discretionary judgment to establish the contours of what constitutes a "substantial contribution," which it defined as "that contribution which, *in the judgment of the Commission*, greatly assists the Commission to promote a public purpose in a matter relating to an issue by the adoption, at least in part, of the participant's position.  A showing of substantial contribution shall include, but need not be limited to, a demonstration that the

---

[12] See *Order Instituting Investigation By Rulemaking into the Adoption of New Rules of Practice and Procedure to Process and Administer Requests for Attorney and Witness Fees and Other Expenses of Participants in Commission Proceedings 100*, Decision No. 83-04-017 (1983) 11 Cal.P.U.C.2d 177, page 3 [1983 Cal.P.U.C. Lexis 942, pp. *9–*10].

15

Commission's order or decision has adopted factual contention(s), legal contention(s), and/or specific recommendation(s) presented by the participant." (OII 100 Regulations, rule 76.26, italics added.)

The OII 100 Regulations drew an immediate challenge from a group of utilities in *Southern California Gas Co. v. Public Utilities Com.* (1985) 38 Cal.3d 64 (*Southern California Gas*) on the ground that the CPUC's assertion of regulatory authority to provide for intervenor compensation was directly contrary to the Supreme Court's decision in *CLAM*. But while *Southern California Gas* was pending in the Supreme Court, the Legislature enacted Article 5, passing it in the form of Senate Bill No. 4, which was signed by Governor Deukmejian on July 5, 1984. (Stats. 1984, ch. 297, § 2, pp. 1526–1529.) [13] Borrowing definitional language drawn from rule 76.26 of the OII 100 Regulations—including use of the phrase "in the judgment of the Commission"— Article 5 defined "substantial contribution" to mean "the customer's presentation has substantially assisted the commission in the making of its order or decision because the order or decision has adopted in whole or in part one or more factual contentions, legal contentions, or specific policy or procedural recommendations presented by the customer." (*Id*. at p. 1527, § 1802, former subd. (g), now included in subd. (i), amended by Stats. 1992, ch. 942 § 3, redesignating § 1802, former subd. (g) as former subd. (h) (Assem. Bill 1975); further amended by Stats. 2003, ch. 300 § 2, redesignating § 1802, former subd. (h) as subd. (i) (Sen. Bill 521).)

Although the open-ended framing of the "substantial contribution" definition in rule 76.26 (a "showing of substantial contribution shall include, but need not be limited to . . .") (OII 100 Regulations, rule 76.26) was in some respects more expansive than the definitional language ultimately adopted by statute in Article 5, there is no indication in the legislative history that the definition of "substantial contribution" was intended to be

_____

[13] To carry Article 5 into effect, the CPUC promulgated a new set of intervenor compensation regulations tracking the statutory language of Article 5 in identical terms. (See Cal. Code Regs., tit. 20, art. 18.7, former rules 76.51–76.62 (the Article 5 Implementing Regulations).)

different, in substance, from that used in rule 76.26. Indeed, in other respects the definitional language adopted by statute was slightly broader than that used in rule 76.26.[14] Nothing in the legislative history shows any particular focus on these textual nuances or any intent to narrow the CPUC's discretionary power to make findings of "substantial contribution." And one thing is abundantly clear: The main purpose of Article 5, stated over and over in the legislative history—indicating that the Legislature acted in direct response to *Southern California Gas*—was to "confirm*"* the statutory authority for the CPUC's then existing practice of awarding intervenor compensation under the OII 100 Regulations, retrospectively, and to codify that practice by statute, going forward.[15] In light of newly enacted Article 5, the Supreme Court dismissed the

---

[14] As introduced by Senator Montoya, Senate Bill No. 4's definition of "substantial contribution" adopted by the Legislature required a showing that the intervenor "has substantially assisted the commission in making [an] order or decision because . . . the order or decision has adopted one or more factual contentions, legal contentions, or specific recommendation presented by" the intervenor. (Sen. Bill No. 4 (1982–1983 Reg. Sess.) as introduced December 6, 1982 (hereafter Senate Bill 4, sometimes referred to as "SB 4"); art. 5, § 1802, former subd. (g).).) That definitional language tracked, word for word, the definition of "substantial contribution" in rule 76.26 of the OII Regulations, which required a showing that an "order or decision has adopted factual contention(s), legal contention(s), and/or specific recommendation(s) presented by" the intervenor, except that rule 76.26 permitted a finding of "substantial contribution" where the intervenor's position was adopted only "in part." (OII Regulations, rule 76.26.) As SB 4 was amended after conference negotiations between the Assembly and the Senate between April and August of 1983—and as ultimately enacted—the bill continued to track the language of rule 76.26, but added some breadth, revising the definition of "substantial contribution" to require a showing that the intervenor "has substantially assisted the commission in the making of its order or decision because the order or decision has adopted *in whole or in part* one or more factual contentions, legal contentions, or specific policy *or procedural recommendations* presented by the customer." (Sen. Bill 4, § 2, adding art. 5, § 1802, former subd. (g), as amended in conference and passed by the Assembly June 11, 1984 and by the Senate June 21, 1984.)

[15] Legislative Counsel's Digest of Senate Bill 4 ("This bill would state the intent of the Legislature to confirm the authority of the commission to make awards to participants in proceedings of the commission commenced on or before December 31, 1984, pursuant to the commission's rules and regulations, and to require that awards in proceedings commenced on and after January 1, 1985, be governed by this bill."); Senate Democratic and Republican Caucuses, Conference Report, joint analysis of Senate Bill 4

17

writ proceedings in *Southern California Gas* as moot. (*Southern California Gas*, *supra*, 38 Cal.3d at p. 67.) The court's brief opinion resolving the case explained that "even if the Legislature cannot 'confirm' that such authority always existed, despite contrary judicial precedent, it may furnish the missing authority nunc pro tunc. SB 4 appears to have that effect." (*Ibid.*)

### 4. *The 1992 Amendments*

Responding to a Report of the California Auditor General entitled "The California Public Utilities Commission Can Improve Aspects of its Program to Compensate Intervenors" (1992) (the State Auditor's Report),[16] the legislature passed Assembly Bill No. 1975 in August 1992 (Assem. Bill No. 1975 (1991–1992 Reg. Sess.) (hereafter Assembly Bill 1975, sometimes referred to as "AB 1975")), substantially updating

---

(June 7, 1984) ("[t]he amendments . . . confirm the authority of the [C]PUC to issue awards under their current rules until December 31, 1984, after which the terms of this bill shall become effective"); Senate Republican Caucus Digest re: Senate Bill 4 (June 13, 1984) ("This bill would now state the intent of the Legislature to confirm the authority of the Public Utilities Commission . . . to make awards to participants in [C]PUC proceedings commenced on or before December 31, 1984, pursuant to [C]PUC rules and regulations, and to require that awards in proceedings commenced on and after January 1, 1985, be governed by this bill."); Senate Democratic Caucus Conference Report on Senate Bill 4 as amended August 30, 1983, p. 2 ("this bill merely provides the [C]PUC with statutory authority for the existing practice of awarding intervenor fees"); Assembly Office of Research, Conference Committee Report No. 011583 on Senate Bill 4 as amended August 30, 1983 (Senate bill, adopted with Assembly amendments following conference, "provided a statutory basis for the Public Utilities Commission . . . to award fees for costs incurred by advocates of residential consumer interests who participate in public utility rate proceedings before the [C]PUC . . . The [C]PUC already awards these costs as a matter of practice."). See *People v. Martinez* (1987) 194 Cal.App.3d 15, 22 (in relying on legislative history "courts may properly consider committee reports [citation], partisan caucus analyses [citation], and the digest of the Legislative Counsel [citation].").

[16] We take judicial notice of this report on our own motion as an official governmental act under Evidence Code sections 452, subdivision (c) and 459. Under the same statutes we judicially notice all legislative history materials cited in this opinion.

Article 5 with a set of amendments (the 1992 Amendments).[17]  Rather than promote broad public participation in CPUC proceedings, the State Auditor found that Article 5 had actually created a disincentive for many groups who might have wanted to participate in CPUC proceedings, but were wary of doing so because of the uncertainty surrounding whether they would be paid.  (State Auditor's Report, p.13.)  Thus, the focus of AB 1975 was to revise Article 5 so that, implementing it going forward, the CPUC could achieve the Legislature's original objective of encouraging broad public input in CPUC proceedings by creating stronger incentives for intervenors to participate.

AB 1975 was sponsored by the Chair of the Assembly Committee on Utilities and Commerce, Assemblywoman Gwen Moore.  (Assem. Bill 1975 as introduced Mar. 8, 1991.)  In remarks in committee hearings and when AB 1975 came before the Assembly for final vote, Assemblywoman Moore argued that it was necessary to broaden the circumstances in which compensation would be paid in order "to assure that effective intervenor participation continues as the [C]PUC moves toward more informal proceedings, with less emphasis on adversarial process with formal hearings, decisions and orders."  (Statement of Assemblywoman Moore on Assem. Bill. 1975 on Assembly Floor (Aug. 26, 1992).) [18]  Moore's bill was passed in the Assembly and Senate and

---

[17] See Senate Committee on Energy and Public Utilities, Bill Analysis for June 23, 1992 Hearing on Assembly Bill 1975 as amended June 18, 1992 ('The bill responds, in part, to a January 1992 report by the Auditor General of California"); Senate Rules Committee, Floor Analysis, Assembly Bill 1975, Third Reading (Aug. 24, 1992) (same).

[18] See also Assembly Committee on Utilities and Commerce, Hearing Digest on Assembly Bill 1975 (April 29, 1991), comments at p. 2, italics added ("Since the landmark decision of the California Supreme Court in [*CLAM*] describing the [C]PUC's power to award attorneys fees and costs to successful litigants in their proceedings, the [C]PUC and the Legislature have attempted to articulate procedures for affording nonutility participants in [C]PUC proceedings reimbursement for their costs. . . . In 1983, the [C]PUC issued OII 100, a comprehensive set of rules governing intervenor compensation.  These rules were appealed to the California Supreme Court, and during the pendency of the appeal the Legislature enacted SB 4 (Montoya, 1984) . . . .[¶] . . . [¶] The intervenor funding regime established by SB 4 is affected by changes in the regulatory process which have occurred in the years since its adoption.  The [C]PUC has increased the use of informal proceedings and procedures, such as settlement, workshops,

signed by Governor Wilson on September 26, 1992. (Stats. 1992, ch. 942, p. 4485.) AB 1975 made two notable changes to Article 5. It revised and expanded the defined term "proceeding" in section 1802, subdivision (f), which marks out the range of procedural settings in which Article 5 applies, extending its coverage from only rate-related proceedings to a broad array of proceedings, both formal and informal.[19] AB 1975 also added a very detailed statement of legislative intent. Section 1801.3, among other things, directs the CPUC to implement Article 5 "in a manner that encourages the effective and efficient participation of all groups that have a stake in the public utility regulation process." (§ 1801.3, subd. (b).)[20]

---

advice letters, etc. The [C]PUC also extended the intervals between formal proceedings, such as general rate cases, and in the case of telephone utilities, virtually eliminated them. *As a result[,] the opportunities for a formal [C]PUC decision adopting a party's contention have been reduced. The effect of creating more long and drawn-out proceedings, coupled with the reduction in the number of proceedings that are actually brought to closure*, is straining the ability to participate of even the most dedicated consumer advocate organizations."); Assembly Committee on Utilities and Commerce, Hearing Digest on Assembly Bill 1975, as amended May 7, 1991, page 3 ("The CPUC has been making increased use of informal proceedings, such as workshops and settlement discussions, which do not directly effect [*sic*] rates. . . . This bill specifically provides for compensation in these informal proceedings."). See *In re R.V.* (2015) 61 Cal.4th 181, 194 (relying on views of author of legislation "whose statement was included in a number of bill analyses" to discern legislative intent where statute, as enacted, was silent on point in dispute).

[19] (See Stats. 1992, ch. 942, § 3, adding section 1802, subdivision (f) by amendment; Assem. Bill 1975 as amended July 22, 1992.) With the broadened definition of "proceeding" that was enacted as part of the 1992 Amendments, there was no longer any justification for having so many separate sets of rules governing intervenor compensation. Thus, the CPUC, citing the unnecessary complexity of having multiple sets of regulations, undertook a rules consolidation exercise in 1993, repealing the PURPA Regulations and the OII 100 Regulations, and replacing the Article 5 Implementing Regulations with some brief language cross-referencing Article 5. (See Cal.P.U.C. Ruling No. 84-12-028 (Dec. 16, 1992), attached as Appendix B to *Interim Opinion Issuing Proposed Rules to Govern Compensation of Intervenors in Commission Proceedings* (1993) 48 Cal.P.U.C.2d 389, 404–410 [1993 Cal.P.U.C. Lexis 163, pp. *15–*23].)

[20] Section 1801.3, subdivision (b), was added by amendment June 17, 1992. (Assem. Bill 1975 as amended June 17, 1992.) This effort to encourage wide

The 1992 Amendments, especially when taken together with the broader history of Article 5, appear to be inconsistent with New Cingular's core position in this case, resting, as it does, on the premise that there can be no "substantial contribution" to an "order or decision" of the CPUC without a merits determination. The heart of New Cingular's argument, drawn from the statutory structure, is that Article 5 unfolds in a logical progression, becoming increasingly specific, from generalized statements of purpose in section 1801.3, to more specific language in section 1802, subdivision (i), to even more specific language in section 1804, subdivisions (c) and (e), where the references to "*final* order or decision" appear (§ 1804, italics added). But that mode of interpretation begs the ultimate question here, since it tells us little about whether an "order or decision" must be on the merits. It also assumes the Legislature intended Article 5 to be a complete expression of every circumstance in which intervenor compensation could be awarded, leaving for the CPUC only a narrow ministerial role in applying the statutory language. The legislative history suggests otherwise, showing that, from the beginning, when Article 5 was enacted in 1984, the Legislature contemplated a

participation in regulatory proceedings follows a modern trend in administrative law and procedure to open regulatory process as broadly as possible to public input. (See Mariano-Florentino Cuéllar, *Rethinking Regulatory Democracy* (2005) 57 Admin. L. Rev. 411, 420 [In formal rulemaking proceedings, "agencies ordinarily provide notice of proposed regulations, and members of the public have a limited right to take part in most regulatory rulemaking proceedings. With few exceptions, the right belongs to the public regardless of whether they are savvy lawyers for a chemical products company or individual laypeople with no particular technical expertise."].) A variety of new forms of administrative proceeding began to surface across the country in the 1970s, including participatory compensation programs, all of which were designed to encourage maximum input into regulatory decisionmaking, creating new opportunities for a more diverse set of voices to participate. (See Daniel Schwartz, *Preventing Capture Through Consumer Empowerment Programs: Some Evidence From Insurance Regulation*, in Preventing Regulatory Capture, Special Interest Influence and How to Limit It (Carpenter & Moss edits., 2014) at p. 369 ["In recent years, lawmakers have experimented with cooperative and participatory approaches to regulation that fall loosely under the heading of 'new governance,' " and which emphasize "flexible, participatory and collaborative programs"].) The expression of intent in section 1803.1, subdivision (b), from its inception has been in line with this trend.

significant role for the CPUC in defining the scope and meaning of the intervenor compensation rules, as applied. The enactment of section 1801.3, subdivision (b) as part of the 1992 Amendments serves to confirm this legislative expectation.

### C. Judicial Review of the CPUC's Interpretation of Article 5

We now turn to the scope of our own review of the agency decisions at issue in this writ proceeding, focusing particularly on how much deference we should give to the CPUC's interpretation of its power to award intervenor compensation, as conferred upon it in Article 5. Having satisfied ourselves that the TURN Award and the CforAT Award are based on a reasonable construction of Article 5, the CPUC contends our task is complete. According to the CPUC, the applicable standard of review is so narrow that we should simply defer to its decisionmaking, without further inquiry, denying the writ and leaving these awards undisturbed. Considerable deference is warranted, we agree, but in our view, the applicable standard of review calls for a more searching inquiry than the CPUC would have us apply, one that ultimately leads us to reject the CPUC's stated reasons for issuing the awards at issue here, while deferring to its overall conclusion that TURN and CforAT are eligible for compensation.

#### 1. *The Applicable Standard of Review*

"[T]he [C]PUC is not an ordinary administrative agency, but a constitutional body with broad legislative and judicial powers." (*Wise v. Pacific Gas & Electric Co.* (1999) 77 Cal.App.4th 287, 300.) On judicial review, the CPUC's decisions historically have been generally presumed valid, not to be disturbed absent a manifest abuse of discretion or unreasonable interpretation of the relevant statute, particularly on matters of procedure. (See *Greyhound Lines, Inc. v. Public Utilities Com.* (1968) 68 Cal.2d 406, 410–411 (*Greyhound*); *Southern Cal. Edison Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 1086, 1096–1097.) "[W]hen no constitutional issue is presented, a [C]PUC decision has the same standing as a judgment of the superior court: it is presumed correct, and any party challenging the decision has the burden of proving that it suffers from prejudicial error." (*Pacific Gas and Electric Co. v. Public Utilities Com.* (2015) 237 Cal.App.4th 812, 838; see generally, *City and County of San Francisco v. Public Utilities*

*Com.* (1985) 39 Cal.3d 523, 530; *Southern California Edison Co. v. Public Utilities Com.* (2014) 227 Cal.App.4th 172, 185.) "Indeed, our Supreme Court has repeatedly called the presumption in favor of the Commission's decision a 'strong' one. (*Greyhound* [ , *supra,* at p. 410] ['There is a strong presumption in favor of the validity of the commission's decisions . . . .']; *Pacific Tel. & Tel. Co. v. Public Util. Com.* (1965) 62 Cal.2d 634, 647 ['strong presumption of the correctness of the findings . . . of the commission, which may choose its own criteria or method of arriving at its decision'].)" (*Pacific Gas and Electric Co. v. Public Utilities Com.*, *supra*, at p. 838.)

But the call for deference to agency decisionmaking is not uniformly compelling in all circumstances. The final word on question of statutory interpretation always rests with the judiciary. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7, 11 (*Yamaha*).) The rationale for deference is strongest when the challenged action by the agency results from a rulemaking decision within the authority delegated to the agency (*id.* at pp. 11–12), where the agency interprets one of its own regulations (*Pacific Gas and Electric Co. v. Public Utilities Com.*, *supra*, 237 Cal.App.4th at p. 840; *Utility Consumers' Action Network v. Public Utilities Com.* (2010) 187 Cal.App.4th 688, 697–698), or where the agency engages in fact-finding based on conflicting evidence (*Pacific Gas and Electric Co. v. Public Utilities Com.*, *supra*, at pp. 838–839). One basis for challenging a CPUC decision is that the CPUC acted "without, or in excess of, its powers or jurisdiction." (§§1757, subd. (a)(1), 1757.1, subd. (a)(3).) Where the statute subject to interpretation is one that defines the very scope of the CPUC's jurisdiction, *Greyhound* deference is not appropriate. (*San Pablo Bay Pipeline Co., LLC v. Public Utilities Com.* (2015) 243 Cal.App.4th 295, 310; *PG&E Corp. v. Public Utilities Com.* (2004) 118 Cal.App.4th 1174, 1194.) And the CPUC may not exercise its jurisdiction in a manner inconsistent with other express provisions of the Public Utilities Code. (*PG&E Corp. v. Public Utilities Com.*, *supra*, 118 Cal.App.4th at pp. 1198–1199; see *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 299–300.)

Citing *Greyhound* and its progeny, the CPUC urges us to recognize the " 'strong presumption' " that *Greyhound* sets up in its favor. Under the *Greyhound* test, the CPUC

argues, " 'the [C]ommission's interpretation of the Public Utilities Code should not be disturbed unless it fails to bear a reasonable relation to statutory purposes and language.' " (*Greyhound, supra,* 68 Cal.2d at p. 410.) New Cingular, on the other hand, takes the position that the CPUC has acted in excess of its authority and argues that we have an independent obligation to construe the statutory language under *Yamaha, supra,* 19 Cal.4th at page 11. We conclude New Cingular has the better of the argument on this point. Because we are reviewing the CPUC's interpretation of a statute that defines the reach of its power to enter the awards under review, *Yamaha*, not *Greyhound*, governs the applicable standard of review. It is not enough for the CPUC simply to demonstrate that its proffered interpretation bears a reasonable relation to the language and purposes of Article 5 under *Greyhound*. Since we are dealing with a set of "explicit, limited fee rules" (*Southern California Gas*, *supra*, 38 Cal.3d at p. 68) enacted as part of a detailed statutory scheme defining the CPUC's jurisdiction in this area, applying the *Greyhound* test here would effectively swallow the statutory scheme in whole, rendering its limitations subordinate to the CPUC's interpretation of the statute. New Cingular is therefore correct that *Yamaha* supplies the appropriate lens through which to evaluate this case.[21]

### 2.    *The Yamaha Framework*

"Although balancing the necessary respect for an agency's knowledge, expertise, and constitutional office with the courts' role as interpreter of laws can be a delicate matter, familiar principles guide us." (*Gonzales v. Oregon* (2006) 546 U.S. 243, 255.) Under the *Yamaha* framework of analysis, " 'The standard for judicial review of agency interpretation of law is the *independent judgment* of the court, giving *deference* to the

---

[21] But see *The Utility Reform Network v. Public Utilities Com. of State of Cal.* (2008) 166 Cal.App.4th 522, 533 (applying *Greyhound* test in writ proceedings challenging CPUC's interpretation of Article 5; statutory interpretation supporting denial of intervenor compensation upheld without considering *Yamaha*); *Southern California Edison Co. v. Public Utilities Com.* (2004) 117 Cal.App.4th 1039, 1050 (CPUC's statutory interpretation supporting grant of intervenor compensation upheld under *Greyhound* test; no mention of *Yamaha*).

24

determination of the agency *appropriate* to the circumstances of the agency action.' " (*Yamaha*, *supra*, 19 Cal.4th at p. 8, italics in original.) Applying the directives of *Yamaha* is a "nuanced" matter, calling upon us to evaluate the "contextual merit of [the agency's] interpretation, together with the rules of statutory construction." (*California School Bds. Assn. v. State Bd. of Education* (2010) 186 Cal.App.4th 1298, 1314–1315.)

Conceptually, the *Yamaha* framework rests on "two classes of [administrative] rules—quasi-legislative and interpretive . . . ." (*Yamaha, supra,* 19 Cal.4th at p. 10.) "[B]ecause of their differing legal sources," the rules in these two categories "command significantly different degrees of deference by the courts." (*Ibid*.) "One kind—quasi-legislative rules—represents an authentic form of substantive lawmaking: Within its jurisdiction, the agency has been delegated the Legislature's lawmaking power. [Citations.] Because agencies granted such substantive rulemaking power are truly 'making law,' their quasi-legislative rules have the dignity of statutes. When a court assesses the validity of such rules, the scope of its review is narrow. If satisfied that the rule in question lay within the lawmaking authority delegated by the Legislature, and that it is reasonably necessary to implement the purpose of the statute, judicial review is at an end." (*Id.* at pp. 10–11.)

At issue in *Yamaha* was a summary legal opinion, known as an "annotation," prepared by the legal staff of the State Board of Equalization (Board). In practice before the Board, annotations are nothing but brief written statements—often only a sentence or two—stating the tax consequences of specific hypothetical business transactions. The practice of the Board was to provide annotations to taxpayers in response to requests for legal opinions by the Board, by its field auditors, or by taxpayers. (*Yamaha, supra*, 19 Cal.4th at pp. 4–5.) In a taxpayer's challenge to an assessment by the Board, the Court of Appeal upheld the assessment, giving dispositive weight to an annotation that interpreted section 6009.1 of the Revenue and Taxation Code. (*Id*. at pp. 5–6 & fn. 2.) The Supreme Court reversed and remanded for further consideration on the ground that the Court of Appeal had given too much weight to the annotation and had failed to apply its independent interpretation of the statute. (*Id*. at p. 15.)

25

The specific legal issue presented in *Yamaha* concerned the applicable standard of review for "interpretive" agency decisionmaking. "Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . , that is the source of the presumptive value of the agency's views. An important corollary of agency interpretations, however, is their diminished power to bind. Because an interpretation is an agency's *legal opinion,* however 'expert,' rather than the exercise of a delegated legislative power to make law, it commands a commensurably lesser degree of judicial deference." (*Yamaha, supra*, 19 Cal.4th at p. 11.)

On a question of interpretation, " 'the opinion of an administrative agency as to a statute's meaning may be helpful even if it is "not binding or necessarily even authoritative." ' " (*Pacific Gas and Electric Co. v. Public Utilities Com.*, *supra*, 237 Cal.App.4th at pp. 851–852.) "Courts must, in short, independently judge the text of the statute, taking into account and respecting the agency's interpretation of its meaning, of course, whether embodied in a formal rule or less formal representation. Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth." (*Yamaha, supra,* 19 Cal.4th at pp. 7–8.) Thus, courts may give weight to agency interpretations of statutes, by degrees, ranging from respectful but minimal consideration, to great weight. "Whether judicial deference to an agency's interpretation is appropriate and, if so, its extent—the 'weight' it should be given—is thus fundamentally *situational*. A court assessing the value of an interpretation must consider a complex of factors material to the substantive legal issue before it, the particular agency offering the interpretation, and the comparative weight the factors ought in reason to command." (*Id.* at p. 12.) Applying

26

this "situational" test (*id.* at p. 12), the *Yamaha* court held that the Board's annotations were entitled to " 'some consideration,' " but not great weight (*id.* at p. 15).[22]

### 3. *Yamaha* as Clarified by *Ramirez*

*Ramirez v. Yosemite Water Co.* (1999) 20 Cal.4th 785 (*Ramirez*), added a key refinement to the *Yamaha* framework. Concurring in *Yamaha*, Justice Mosk explained, "There is an important qualification to the independent judgment/great weight standard . . . when a court finds that the Legislature has *delegated* the task of interpreting or elaborating on a statute to an administrative agency. A court may find that the Legislature has intended to delegate this interpretive or gap-filling power when it employs open-ended statutory language that an agency is authorized to apply or 'when an issue of interpretation is heavily freighted with policy choices which the agency is empowered to make.' " (*Yamaha, supra,* 19 Cal.4th at p. 17 (conc. opn. of Mosk, J.), italics in original.) Highlighting language from a footnote in Justice Brown's opinion for the majority in *Yamaha*, Justice Mosk emphasized that administrative decisionmaking does not always fall "neatly into one category or the other . . . ." (*Ibid;* see *id.* at p. 6, fn. 3.)

Barely a year after *Yamaha* was decided, the California Supreme Court unanimously adopted Justice Mosk's clarifying qualification, explaining that because the *Yamaha* framework is a "continuum," some agency decisions will be hybrid in nature, having "*both* quasi-legislative and interpretive characteristics, as when an administrative agency exercises a legislatively delegated power to interpret key statutory terms" (*Ramirez*, *supra*, 20 Cal.4th at p. 799, italics added), allowing it to " 'fill up the details' of a statutory scheme" (*ibid.*). Without resolving what standard of review applies to agency

---

[22] The analytic framework established in *Yamaha* drew heavily from Justice Jackson's opinion for the United States Supreme Court in *Skidmore v. Swift & Co.* (1944) 323 U.S. 134, 140 (*Skidmore*), which presented an analogous scope of review question under the federal Administrative Procedure Act. *Skidmore*, like *Yamaha*, involved an agency position that was adopted without the statutory formalities of administrative process that are typically used for decisionmaking intended to have the force of law (i.e., notice-and-comment rulemaking or on-the-record adjudicative decisionmaking). (*Id.* at pp. 137–140.)

decisions of this kind, *Ramirez* analyzed the decision under review there—a Wage Order issued by the California Industrial Welfare Commission, defining a statutory term in section 1171 of the Labor Code—as a hybrid decision, testing it under the standards applicable to both quasi-legislative and interpretive decisions. (20 Cal.4th at pp. 799–800.) The court ultimately upheld the Wage Order in question, finding, first, that it was within the scope of authority conferred on the Industrial Welfare Commission by the Legislature and was reasonably necessary to effectuate the purposes of Labor Code section 1171, and, second, even treating the Wage Order as "a purely interpretive regulation," it was entitled to "considerable judicial deference" as an agency decision of long standing that had been adopted formally by notice-and-comment procedures.[23] (*Id.* at pp. 800–801.)

Whether a unitary standard of review applies to agency action with characteristics of both quasi-legislative and interpretive decisionmaking, and if so, what that standard is, has not yet been settled by the California Supreme Court. (See *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 437 (conc. & dis. opn. of Kennard, J.) ["This court has not resolved what standard of review applies to such *hybrid* cases"], italics in original.) But in the meantime, the courts of appeal have used the same two-track approach that the Supreme Court used in *Ramirez*, analyzing such decisions under the standards of review applicable to both. (See *Diageo-Guinness USA, Inc. v. Board. of*

---

[23] Although the federal law of deference to agency interpretive decisionmaking has diverged sharply from that of California in the years since *Skidmore* was decided (see *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* (1984) 467 U.S. 837, 842–843), in recent years the United State Supreme Court has decided a series of cases that revitalize *Skidmore*, applying it in much the same way *Ramirez* applies *Yamaha*. (See *U.S. v. Mead Corp.* (2001) 533 U.S. 218, 237 [explaining that even in the absence of an express general delegation of lawmaking power, "circumstances pointing to implicit congressional delegation" to fill in gaps in a statutory scheme "present a particularly insistent call for deference"]; *Barnhart v. Walton* (2002) 535 U.S. 212, 222 ["the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time" all call for the highest level of deference].)

*Equalization* (2012) 205 Cal.App.4th 907, 917–922 [regulations adopted by the Board of Equalization defining the statutory term "distilled spirits" found to be both quasi-legislative and interpretive; regulation invalidated]; *Megrabian v. Saenz* (2005) 130 Cal.App.4th 468, 477–487 [benefits eligibility decision by the California Department of Social Services, embodied in its Manual of Policies and Procedures, found to be both quasi-legislative and interpretive; agency decision upheld].) In this case, the first step of the *Ramirez* test is easily satisfied, since the interpretive position the CPUC has taken is broadly within the scope of authority conferred upon it by Article 5, as recognized in *Southern California Gas,* and bears a reasonable relation to the purposes of Article 5. The question remains, however, what weight the CPUC's decision in this case should be given, applying *Yamaha* with *Ramirez* in mind.

### D. Application of *Yamaha*

In evaluating the deference to be accorded agency decisionmaking under *Yamaha*, we apply a group of interrelated "situational" factors that break down into two broad categories (*Yamaha, supra,* 19 Cal.4th at pp. 11–13): first, those suggesting that the agency may have some "comparative interpretive advantage" over courts in deciding the issue in question (*id*. at pp. 11–12), and, second, those indicating that the interpretation in question is " 'probably correct' " (*id*. at pp. 12–13).

The comparative advantage criteria all focus on the substantive nature of the interpretive issue decided by the agency. We look to whether " 'the agency has expertise and technical knowledge, especially where the legal text to be interpreted is technical, obscure, complex, open-ended, or entwined with issues of fact, policy, and discretion,' " as for example when an agency is interpreting its own regulations, since it is "likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another" (*Yamaha*, *supra,* 19 Cal.4th at p. 12). The likely-to-be-correct criteria, by contrast, all focus on circumstantial evidence surrounding the agency's decision. Here, we look to whether there are indications of careful consideration by senior agency officials (*id*. at p. 13), whether the agency " 'has consistently maintained the interpretation in question, especially if [it] is long-standing' "

29

(*ibid.*), whether the interpretation was contemporaneous with legislative enactment of the statute being interpreted (*ibid.*), and whether the decision or rule in question was adopted in accordance with the California Administrative Procedure Act, since that statute requires formal process (e.g., notice-and-comment procedures for issuance of regulations) "enhanc[ing] the accuracy and reliability of the administrative product" (*ibid.*).

1. *The Position Taken By the CPUC Is Informed By Significant Expertise, Is One Of Long Standing, and Existed At The Time Of Article 5's Enactment.*

Applying *Yamaha*'s "situational" factors on this record, three factors—agency expertise, longevity of the CPUC's interpretive position, and the contemporaneousness of that position with enactment—appear to be most important, and they all cut in favor of giving deference to CPUC's interpretation. First, it seems undeniable that the CPUC has considerable expertise relevant to its interpretation of Article 5, since the origin of the "substantial contribution" test goes back to a set of regulations that the CPUC itself adopted in 1980, and since the CPUC has decades of accumulated practical experience applying iterations of that test. It also seems clear that when the Legislature enacted Article 5, and then amended it significantly in 1992, it was building on top of the CPUC's administrative experience when it codified and refined the "substantial contribution" test.

Second and third, the interpretive position taken by the CPUC in this case—at least in its outcome, putting aside for now its reasoning—is one of long standing, so long-standing, in fact, that it dates all the way back to Article 5's enactment, and before. For context here in particular, the statutory history must be kept in mind. Left unaddressed explicitly in Article 5, even as amended in 1992, was a question brought into sharp focus by the broadened definition of "proceeding" in section 1802, subsection (f) as revised: What happens with fee eligibility when an intervenor participates extensively in proceedings such as workshops, mediations, settlement conferences or any other of the many forms of informal proceedings (coming into use in the early 1990s more and more often, as Assemblywoman Moore pointed out) in which no one wins on the merits in the conventional sense? Clearly, the Legislature contemplated that there would be fee

30

eligibility in such proceedings, for that was why AB 1975 expressly included non-traditional types of proceeding in the definition of "proceeding."  But other than that, nothing in the amended language of Article 5 speaks to the issue directly.  And while there is no explicit answer to this question in the revised language of Article 5, by 1992 the Legislature was acting against a backdrop in which there was already a clear answer.

The CPUC first answered the question in November 1981 in *The Environmental Defense Fund Requests Compensation for its Participation in SoCal Edison Co.'s Application for a Certificate for the Harry Allen/Warner Valley Energy System* (1981) 7 Cal.P.U.C.2d 75 [1981 Cal.P.U.C. Lexis 370] (*Allen/Warner*), the very case that led the CPUC to promulgate the OII 100 Regulations.  In *Allen/Warner*, PG&E, SoCal Edison and several other utilities sought a certificate of public convenience and necessity to operate a coal-fired power plant.  The Environmental Defense Fund (EDF) participated extensively in these certificate proceedings as an intervenor, but ultimately there was no decision on the merits because the certificate application was abruptly withdrawn by the utility proponents on the eve of the hearing.  (*Allen/Warner, supra,* 1981 Cal.P.U.C. Lexis 370, at pp. *8–*10.)  Acknowledging that strict application of the "substantial contribution" test required a showing that it had "adopted" some "factual contention(s), legal contention(s), and/or specific recommendation(s)" of EDF in an "order or decision," the CPUC decided that an "exception" was warranted for the "unique circumstances" of an unexpected, abrupt dismissal.  (*Allen/Warner, supra,* 1981 Cal.P.U.C. Lexis 370, at pp. *8, *46–*47, *61.)  This exception—explained in *Allen/Warner* as a discretionary rule, applicable as a matter of equity—was ultimately codified in rule 76.26 of the OII 100 Regulations, which provided that "In proceedings where some or all of the relief sought by a participant is obtained without a Commission order or decision, the participant *may* be entitled to compensation by clearly establishing a causal relationship between its participation and such relief."  (1993 Cal. Code Regs., tit. 20, art. 18.6, former § 76.26 (former rule 76.26), italics added.) [24]

---

[24] When the Legislature was considering enactment of Article 5, it was not only aware of the pending *Southern California Gas* case, the uncertainty around the CPUC's

Since *Allen/Warner* was decided in 1981, the CPUC has invoked its discretion to award intervenor compensation many times in cases resolved without a decision on the merits, in a wide variety of settings.[25] Among these cases was a telecommunications

---

authority raised by *CLAM*, and the fact that the CPUC had adopted the OII 100 Regulations (see Section III.B.3, *ante*)—for all of that history led to the introduction of SB 4—but there is also some indication it was *specifically* aware of the *Allen/Warner* case. (See Legis. Analyst, analysis of Sen. Bill 4, as amended in Senate Apr. 7, 1983, p. 2 ["Existing state law does not contain specific statutory authority for the commission to award intervenor fees to advocates of residential consumer interests. The awarding of such fees by the [C]PUC began following a 1979 California Supreme Court decision authorizing the practice. *The commission subsequently issued a decision in November 1981 which currently serves as the basis for [C]PUC awards of intervenor fees* in most proceedings. [¶] [T]his bill merely provides the [C]PUC with statutory authority for the existing practice of awarding intervenor fees . . . ."], italics added.)

[25] See, e.g., *Opinion Awarding Compensation to TURN in Application of Southern California Edison Company* (March 21, 2002) Cal.P.U.C. Decision No. 02-03-034 page 4 <http://www.cpuc.ca.gov> [2000 Cal.P.U.C. Lexis 1106, p. *5] ("Where a party has participated in settlement negotiations and endorses a settlement of some or all issues, the Commission uses its judgment and the discretion conferred by the Legislature to assess requests for intervenor compensation."); *Opinion on Request for Intervenor Compensation in Application of Pacific Gas and Electric Company Submitting Electric Rate Proposal for Direct Access Services Described in Decision 97-10-087, etc.* Cal.P.U.C. Decision No. 03-06-065 (June 19, 2003) at pages 6, 8 <http://www.cpuc.ca.gov> [1992 Cal.P.U.C. Lexis 1030, pp. *7–8, 10–11] (where utility withdrew ratemaking case that had become moot due to supervening circumstances caused by the energy crisis, the CPUC found that intervenor had substantially contributed to the proceeding before the withdrawal) (hereafter Decision No. 03-06-065); *Opinion Granting Intervenor Compensation to the Utility Reform Network for Substantial Contributions to Decision 05-06-040* (Dec. 15, 2005) Cal.P.U.C. Decision No. 05-12-038 <http://www.cpuc.ca.gov> [2005 Cal.P.U.C. Lexis 534] (dismissal on mootness grounds where proceeding initiated in 2001 became moot because, due to delay in proceeding, information concerning rates for which increases sought had become stale); *Application of Southern California Edison Company (U 338-E) for Order Approving Contracts to Secure Additional Capacity for System Reliability in SP-15* (June 15, 2006) Cal.P.U.C. Decision No. 06-06-026, page 6 <http://www.cpuc.ca.gov> (where utility withdrew its application of approval of new power purchase agreement because it deemed scoping memorandum too limiting, ratepayer advocacy group awarded compensation for its participation in the early stages of the proceeding because its filings "provided useful, substantive articulation of its initial views, . . . thereby supplement[ing] the preliminary record").

merger review proceeding more than a decade ago where the proposed merger was withdrawn before any decision on the merits issued. (See *Opinion on Requests for Intervenor Compensation in Application 99-12-012 of MCI WorldCom, Inc. and Sprint Corporation* (July 17, 2002) Cal.P.U.C. Decision No. 02–07-030 [2002 Cal.P.U.C. Lexis 438] (*MCI*).) The CPUC has consistently ruled since 1981 that it has discretion to award intervenor compensation in cases that end without a decision on the merits, but its rationale has evolved over time. Prior to 1992, as illustrated by *Allen/Warner* itself, the CPUC took the position that there is a discretionary "exception" to the requirement of contribution to an "order or decision" based on vague notions of fairness and equity.[26] Following the 1992 Amendments, as illustrated by *MCI*, the CPUC began to ground its authority to award intervenor compensation in such cases on a textual reading of the statutory definition of "substantial contribution," supported by a policy rationale founded expressly on section 1801.3. [27]

---

[26] See *San Luis Obispo Mothers for Peace's Request for Compensation in Application of Pacific Gas and Electric Co., for Authorization to Establish a Rate Adjustment Procedure for its Diablo Canyon Nuclear Power Plant etc*, Decision No. 89-03-063 (1989) 31 Cal.P.U.C.2d 402 [1989 Cal.P.U.C. Lexis 195, pp. *1, 4](*San Luis Obispo Mothers for Peace*) (even though the CPUC did not adopt the position advocated by intervenors in a proceeding that was resolved by settlement, the intervenors were found to have substantially contributed because they " 'did much to focus our attention on particular issues in the case' " through their attention to safety issues in their evidentiary presentation and their cross-examination of witnesses.).

[27] See *Application of Southern California Edison Company for Approval of Agreements to Sell Its Interests in Four Corners Generating Station and Palo Verde Nuclear Generating Station* (Mar. 21, 2002) Cal.P.U.C. Decision No. 02-03-035 <http://cpuc.ca.gov> ("Failing to award compensation in these circumstances . . . could only chill participation by such groups in the public utility regulation process, an outcome distinctly at odds with Pub. Util. Code § 1801.3(b)."); *Opinion on TURN's Request for Intervenor Compensation in Application 99-03-014 of Pacific Gas and Electric Company to Revise its Electrical Marginal Costs, Revenue Allocation and Rates at the End of the Rate Freeze* (May 8, 2003) Cal.P.U.C. Decision No. 03-05-029, pages 4, 6 <http://cpuc.ca.gov> ("Denying . . . any compensation in a proceeding that is prematurely terminated for reasons that are not reasonably foreseen and are beyond [the intervenor's] control" unjustifiably increases the risk that intervenors will sustain unreimbursed costs associated with public participation); Decision No. 03-06-065, *supra*, at page 8

*MCI* was a case much like this one, where the impact the intervenors had in an aborted merger review proceeding was reflected in a series of procedural victories. In finding that the intervenors had established that they made a "substantial contribution" despite the withdrawal of the proposed merger and the dismissal of the proceeding on mootness grounds, the CPUC explained: "A party may make a substantial contribution to a decision in a number of ways. It may offer a factual or legal contention upon which the Commission relies in making a decision, or it may advance a specific policy or procedural recommendation that the ALJ or the Commission adopts. A substantial contribution includes evidence or argument that supports part of the decision even if the Commission does not adopt the party's position in total. The Commission has provided compensation even when the position [on the merits] advanced by the intervenor has been rejected." (*MCI*, *supra*, 2002 Cal.P.U.C. Lexis 438, at p. *13, citing *San Luis Obispo Mothers for Peace*, *supra*, footnotes omitted.)

From a policy standpoint, the CPUC explained, "the fact that the merger was called off should not militate against an award of compensation. If we denied compensation for substantial efforts on transactions that—through no fault of the intervenor—were not consummated, we would discourage Intervenors such as TURN, UCAN, and Greenlining/LIF from participating in such proceedings." (*MCI*, *supra*, 2002 Cal.P.U.C. Lexis 438, at p. *13.). But the decision in *MCI* was not purely policy-based. The CPUC anchored its reasoning directly in the statutory text, supporting its core rationale—that an interim procedural contribution can be just as significant as a substantive contribution on the merits, and that the final outcome of the proceeding does not necessarily matter—with citations to the statutory definition of "substantial

(explaining that "we believe our interpretation of the statute accommodates unusual circumstances not envisioned by the Legislature and advances the underlying purposes of the intervenor compensation program," and citing § 1801.3, subd. (b), which requires that the statute "be administered in a manner that encourages the effective and efficient participation" by all stakeholders).

contribution."[28] *MCI* read this definitional language, in effect, as adopting its original conception of the meaning of "substantial contribution": "Decisionmaking is a process," the CPUC explained in its June 1980 Order Establishing PURPA Regulations, and "[s]ubstantial contributions are made in many ways and at many times in the process." (4 Cal.P.U.C.2d 3, 8 [1980 Cal.P.U.C. Lexis 636, *21–*22].)

2.       *The CPUC's Interpretation of Article 5 Qualifies for*
*Treatment As "Hybrid" Agency Decisionmaking Under* <u>Ramirez</u>

Although the agency expertise, decisional longevity and contemporaneity with enactment factors under *Yamaha*, by themselves, point toward giving the CPUC's decisionmaking something more than minimal deference, *Ramirez* further tips the *Yamaha* calculus in the CPUC's favor. The awards at issue here, in our view, qualify for treatment as "hybrid" decisions where the CPUC was called upon to interpret a statute using a mixture of policy-making and conventional legal analysis. Our review of the statutory history gives us ample reason to conclude that the Legislature not only agreed with the CPUC's view that intervenor compensation may be awarded on a discretionary basis in cases that resolve short of a decision on the merits, but more than that, delegated to the CPUC the authority to "fill in gaps" in Article 5 in the course of administering it based on express policy guidance in the statute. In enacting Article 5 in 1984, the Legislature confirmed the CPUC's power to address intervenor compensation on its own,

---

[28] (See *MCI, supra,* 2002 Cal.P.U.C. Lexis 438, at p. *12, fns. 6–9, citing former § 1802, subd. (h), now renumbered subd. (i); *Opinion on TURN's Request for Intervenor Compensation in Application 00-01-009 of Southern Cal. Edison* (Aug. 22, 2002) Cal.P.U.C. Decision No. 02-08-061 at pp. 3, 5, 7 <http://cpuc.ca.gov> [where CPUC merely adopted a procedural recommendation by intervenor, the CPUC awarded compensation, citing § 1802, former subd. (h), now subd. (i)].) Contrary to New Cingular's suggestions that allowing intervenor compensation without any showing of a contribution to an "order or decision" on the merits would give the PUC "unfettered" discretion to reward intervenors for minimal participation, the CPUC long ago appears to have rejected the idea that it should adopt a standard under which compensation is available for nothing more than "good faith participation" in its proceedings, untethered to the plain terms of the statute requiring a contribution to some "order or decision." (*Order Instituting Rulemaking on the Commission's Intervenor Compensation Program* (1998) 79 Cal.P.U.C.2d 628 [1998 Cal.P.U.C. Lexis 429, at pp. *70–*72].)

and then, in 1992, gave the CPUC explicit policy criteria in section 1801.3, subdivision (b) to guide Article 5's administration. In light of this history, we conclude that the Legislature has expressly conferred power on the CPUC to " 'fill up the details' " of the statutory scheme. (*Ramirez*, *supra*, 20 Cal.4th at p. 799.)

The Department of Insurance administers a statutory intervenor compensation program under a statutory scheme analogous to Article 5, and in turning back a challenge to an interpretation of that scheme by the Department of Insurance—a challenge strikingly similar to the one mounted in this case—the Court of Appeal recognized the Insurance Commissioner's delegated "gap-filling" power. That case, *Association of California Ins. Cos. v. Poizner* (2009) 180 Cal.App.4th 1029 (*Poizner*), involved section 1861.10 of the Insurance Code, which, like Article 5, allows awards of compensation to intervenors who make a "substantial contribution" to "the adoption of any order, regulation or decision" in covered regulatory proceedings. The Insurance Commissioner issued regulations permitting awards of compensation in proceedings resolved by settlement "where there is no hearing on the merits." The Court of Appeal rejected an argument from a group of insurers that these regulations exceeded the Commissioner's statutory authority. "[N]ot all details of the administrative rate review process are 'established' by the statutes," the Court of Appeal explained. (*Poizner, supra,* at p. 1048.) "Many procedures and details were necessarily left to regulations and rules to be promulgated by the Commissioner." (*Id.* at p. 1049.) "[T]he absence of specific statutory provisions . . . relating to the resolution of a rate application without a public hearing, as, for example, by way of a settlement, does not mean that regulations permitting such resolution exceed statutory authority, but only that the electorate deferred to and relied upon the expertise of the Commissioner as to such matters." (*Id.* at p. 1053.) We reach the same conclusion as to Article 5 and the CPUC's role in implementing it.[29]

---

[29] In a different context, somewhat further removed from this case than *Poizner*, but still illuminating, courts have addressed a similarly vexing statutory omission in the context of prevailing party fee award statutes, and have come up with a solution that is

New Cingular sought to distinguish *Poizner* at oral argument on the ground that, there, the Department of Insurance carried out its gap-filling power by regulation. We find that distinction to be immaterial. It is true that in cases giving agency interpretive decisionmaking great weight under *Yamaha*, notice-and-comment rulemaking is often involved. (See *California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 390 [finding deference warranted under *Yamaha* to an agency interpretation adopted by regulation and observing that notice-and-comment rulemaking under the California Administrative Procedure Act "subjects potential agency interpretations to procedural safeguards that foster accuracy and reliability"].) But we need not decide whether formal, on-the-record adjudicative decisionmaking— which is what we have here, in the form of a published, reasoned opinion—may be viewed as equivalent to notice-and-comment rulemaking for purposes of *Yamaha*'s "situational factors." *Ramirez* presents a related but slightly different question. Under *Ramirez*, the issue is whether the Legislature intended to confer gap-filling authority. Here, we find not only that it did, but that both the Legislature and the CPUC recognized there was no need for further, formal rulemaking to establish a regime for intervenor compensation in CPUC proceedings. Because the purpose of Article 5 was to reinforce

_____

not unlike the one the CPUC and the Insurance Commissioner have adopted. The issue whether a defendant may recover attorney's fees under prevailing party fee award statutes where the plaintiff seeks voluntary dismissal prior to a decision on the merits is a familiar one in civil litigation, but it is also one frequently overlooked by the Legislature. (See *Coltrain v. Shewalter* (1998) 66 Cal.App.4th 94, 102 ["The vast majority of attorney's fee statutes do not explicitly provide for the event of a voluntary dismissal."].) While historically the term "prevailing party" was construed in such statutes to mean the defendant must win a judgment on the merits (see, e.g., *International Industries, Inc. v. Olen* (1978) 21 Cal.3d 218, 222, 225, the modern trend of authority allows such a showing even in the absence of a judgment on the merits (see, e.g., *Salehi v. Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1156). Even where the governing fee statute is mandatory on its face—providing that an award of fees "shall" be made to the "prevailing party"—it is within the trial court's discretion to award or deny fees in a voluntary dismissal scenario on a pragmatic basis. (See, e.g., *Santisas v. Goodin* (1998) 17 Cal.4th 599, 621–622; *Heather Farms Homeowners Assn. v. Robinson* (1994) 21 Cal.App.4th 1568, 1573–1574; *Winick Corp. v. Safeco Insurance Co.* (1986) 187 Cal.App.3d 1502, 1507–1508.)

and then supplant the CPUC's previously issued regulations governing case-by-case adjudication of entitlement to intervenor compensation,[30] the Legislature appears to have contemplated that case-by-case decisionmaking by the CPUC would be the mode of administratively implementing Article 5.

### E. The Correct Construction of Article 5, Giving Considerable Deference To The Legal Result The CPUC Reached, But Not To Its Reasoning

Although the awards to TURN and CforAT are entitled to considerable deference, the bottom line under both *Yamaha* and *Ramirez* is that, even when an agency is to be given wide-berth in interpreting a statute, we defer only to the extent we are prepared to accept " 'the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.' " (*Yamaha*, *supra,* 19 Cal.4th at pp. 14–15, quoting *Skidmore*, *supra*, 323 U.S. at p. 140, italics omitted.) In this case, the CPUC's explanation of the legal basis for the awards at issue falls short when measured against that bottom-line standard. To begin with, the Final Decision and Order framed its intervenor compensation eligibility determination in terms so broad as to suggest that compensation was due simply as an "acknowledgment" of participation in Docket No. I11-06-009, without any consideration given to the statutory requisites for awarding compensation. Then, when the CPUC did address those statutory requisites in its final order, the Rehearing Decision, its reasoning departed materially from the rationale we see in the long line of prior CPUC decisions awarding intervenor compensation in cases resolved without a decision on the merits, which tends to undermine one of the key factors calling for deference in this case—the longevity and enduring consistency of the agency interpretive position under review.

As we construe Article 5, so long as the advocacy of an intervenor claiming compensation contributes to a CPUC proceeding by "assist[ing] the commission in the making of" any "order or decision" (§ 1802, subd. (i)) and that "order or decision" is part of the "final" resolution of the proceeding (§ 1804, subds. (c) & (e))—whether or not the proceeding is resolved on the merits—then the CPUC may "determine[]" whether in its

---

[30] Over time, that is what eventually happened. (See fn. 19, *ante*.)

"judgment" (§§ 1801.3, subd. (d), 1802, subd. (i)), the intervenor's contribution was "substantial" enough to merit an award of compensation (§ 1803, subd. (a)). In this case, having made a properly supported finding that some position taken by TURN or CforAT was adopted in one or more of the many preliminary "order[s] or decision[s]" it affirmed as part of its final disposition of Docket No. I11-06-009, it was within the CPUC's discretion to conclude that the "substantial contribution" test was met. But that discretion was not unlimited. It was properly exercised only within the confines of Article 5, while respecting the limits of the statutory scheme. Here, for example, to the extent the awards to TURN and CforAT were made based upon interim "procedural recommendations" or for adoption of a contention only "in part," section 1802, subdivision (i) plainly limited the awardable compensation to "all reasonable advocate's fees, reasonable expert fees, and other reasonable costs incurred by the customer *in preparing or presenting that contention or recommendation*." (Italics added.)

The CPUC appears to agree with this reading of Article 5—certainly its extensive history of administrative decisionmaking in non-merits intervenor compensation cases, at least prior to this case, suggests it is in agreement—but we cannot be sure, for the reasoning it employed here pays insufficient heed to the statutory text. Rather than anchor its rationale in its own factual findings and show how those findings fit into the statutory language, the Rehearing Decision identifies a "conflict" between section 1801.3, subdivision (b) (the Legislature's directive that the CPUC administer Article 5 to promote wide participation in its regulatory proceedings by all stakeholders) and section 1802, subdivision (i) (the definition of "substantial contribution") and then announces that, to avoid "absurd consequences," New Cingular's "overly literal" interpretation of section 1802, subdivision (i) must be rejected in the name of harmonization. (Rehearing Decision at p. 6). The Rehearing Decision goes on to cite ten prior CPUC cases similar to *MCI* (*id.* at pp. 7–8 & fn. 8), but nothing in any of those decisions mentions any "conflict" between section 1801.3, subdivision (b), and section 1802, subdivision (i). Indeed, the CPUC seems to acknowledge as much. (*Id.* at p. 8 [stating that the reasoning in such cases was not "specifically stated as harmonizing"].)

39

Based on the CPUC's detailed factual findings and our own reading of Article 5 in light of the statutory history, we are convinced the CPUC was correct to conclude that TURN and CforAT are eligible for intervenor compensation. But we are equally convinced that the legal path it took to justify the awards at issue here is unsustainable. Though we do not find New Cingular's reading of Article 5 to be persuasive either, we cannot say that the result it advocates is in any way "absurd." Nor do we discern a genuine "conflict" between section 1801.3, subdivision (b), and section 1802, subdivision (i). If the mode of harmonizing construction that the CPUC relied on here were valid, virtually any broad statement of intent or purpose in a statute could be used as a roving warrant to nullify more specific statutory limitations that follow. While New Cingular rightly criticizes this interpretive approach for violating several elementary canons of statutory construction, our main concern is that, as applied here, it produces a range of discretion going well beyond anything claimed in *MCI* or other prior administrative decisions since 1992. Correctly analyzed, the statutory construction issue in this case has nothing to do with any need to reconcile internal conflicts within Article 5. We are simply dealing with a "gap" in the statutory language, a stray detail left unaddressed by the Legislature in explicit terms. Framing the analysis narrowly as a gap-filling problem is crucial, for that way of looking at the issue produces discretion that is interstitial in nature, always confined to operating within the boundaries of the gap to be filled.

"Since 'an agency's order must be upheld, if at all, "on the same basis articulated in the order by the agency itself " ' " (*Pacific Gas and Electric Co. v. Public Utilities Com.* (2000) 85 Cal.App.4th 86, 96; see *Securities and Exchange Commission v. Chenery Corp.* (1947) 332 U.S. 194, 196), we will set aside the challenged awards in this case, without prejudice to reinstatement after further consideration by the CPUC in view of this opinion. At oral argument, New Cingular's counsel suggested that, if the only basis to award compensation here was for work done on minor matters such as obtaining extensions of time to file pleadings, the amounts awarded could never have been justified and should have been far less. We express no view on that issue, except to note that, because of the breadth of the legal rationale the CPUC relied upon to justify its exercise

40

of discretion, we cannot tell whether the CPUC considered whether the amounts awarded to TURN and CforAT were reasonable approximations of the fees and costs incurred "in preparing or presenting [the] contention[s] or recommendation[s]" for which these intervenors were credited. (§ 1802, subdivision (i).)

## IV.    CONCLUSION

We decline to adopt the interpretation of Article 5 proffered by New Cingular in this case.  For many decades, the CPUC has taken the position it has discretion to award intervenor compensation in proceedings that end without a decision on the merits, and the awards to TURN and CforAT here are consistent with that long-standing position.  More importantly, however, the awards are consistent with the text of Article 5 and with our reading of legislative intent.  Indeed, we find abundant evidence in the history and pre-history of Article 5 showing that this particular statutory scheme has been built, in effect, on a shared enterprise between the Legislature and the CPUC, with the CPUC having delegated authority under section 1801.3, subdivision (b), to flesh out lacunae in the statutory language, incrementally, when called upon to do so in the course of implementing the overall statutory scheme.  Denying the CPUC the role envisioned for it in this enterprise would do just as much violence to the integrity of Article 5 as misapplying its plain terms.  Still, despite what appears to be ample support in the record for the compensation awards to TURN and CforAT, we cannot accept the legal rationale relied upon by the CPUC in the orders under review, and thus we will vacate the TURN Award, the CforAT Award, and the Rehearing Decision without prejudice to renewal of requests for fees and costs by those intervenors, and redetermination of awards to them consistent with this opinion.

## V.    DISPOSITION

The TURN Award and the CforAT Award are vacated, as is the Rehearing Decision, without prejudice to reinstatement of the awards, in the same or different amounts, on grounds consistent with this opinion.  Except as so ordered, New Cingular's petition for a writ of review is denied.  The parties shall bear their own costs.

41

_____
Streeter, J.

We concur:


_____
Ruvolo, P.J.


_____
Rivera, J.

New Cingular Wireless v. Public Utilities Com. (A144005)


Original Proceedings in writ review of California Public Utilities Commission Decisions 13-05-031, 14-06-026, 14-12-085 (Investigation No. 11-06-009).

Attorneys:

Mayer Brown, J. Tyson Covey, Hans J. Germann; AT&T Services, Inc., J. Scott Paisley, David P. Discher, Niki B. Okcu for Petitioners.


California Public Utilities Commission, Karen V. Clopton, Helen W. Yee, Maria Bondonno for Respondent.


The Utility Reform Network, Robert Finkelstein and Christine Mailloux; Center for Accessible Technology, Melissa W. Kasnitz for Real Parties in Interest.